IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SWEET STREET DESSERTS, INC., | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 12-6115 |
| | : | |
| BETTER BAKERY, LLC, | : | |
| Defendant | : | |

**M E M O R A N D U M**

STENGEL, J.                                                      July 23, 2015

## I.  INTRODUCTION

Plaintiff Sweet Street Desserts, Inc. ("SSD") brought this action against Defendant Better Bakery, LLC ("BB") alleging claims of breach of a November 2, 2001 confidential non-disclosure agreement ("NDA") (Count I), a "passing off" violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count II), a false advertising violation of the Lanham Act (Count III), common law unfair competition (Count IV), unjust enrichment (Count V), and common law misappropriation of trade secrets (Count VI).  In an opinion dated January 7, 2013 ("the January 2013 Opinion"), I granted BB's Motion to Dismiss Counts II, III, and IV of the Complaint.  (See Docket Entry No. 24, Sweet St. Desserts, Inc. v. Better Bakery, LLC, Civ. A. No. 12-6115, 2013 WL 81385 (E.D. Pa. Jan. 7, 2013).) Thereafter, BB answered the Complaint and brought Counterclaims alleging "reverse passing off" under the Lanham Act, 15 U.S.C. § 1125(a) (Counterclaim I), breach of the NDA (Counterclaim II), tortious interference with contract (Counterclaim III),

misappropriation of BB's trade secrets (Counterclaim IV), and common law unfair

competition (Counterclaim V).  (See Docket Entry No. 26.)

Presently pending are the parties' cross motions for summary judgment based

upon separate statements of allegedly undisputed facts.  BB seeks judgment on SSD's

remaining claims, namely breach of contract, unjust enrichment, and misappropriation of

trade secrets.  SSD's Motion seeks judgment on its own breach of contract claim, as well

as on BB's Counterclaim I for reverse passing off under the Lanham Act.  For the

following reasons, I grant BB's Motion and deny SSD's Motion.

## II.  SUMMARY JUDGMENT RECORD

Having reviewed the parties' statements of allegedly undisputed facts, and the

responses thereto, I find that the following facts are undisputed.[1]  SSD began in the fall of

2011 to discuss the potential for BB to work with SSD in connection with SSD's effort to

design a pretzel sandwich product ("the SSD Pretzel Sandwich"[2]) in exchange for the

opportunity to manufacture the product on behalf of SSD.  (App. 19.)  To protect the

sharing of confidential information between SSD and BB during the product

development process, on September 28, 2011 the parties executed a preliminary Mutual

---

[1] SSD has provided a sequentially paginated Appendix ("App.") with its Motion and Statement of Facts ("PSOF").  All citations supporting the PSOF are to that Appendix, noting the page number and exhibit number.  Citations to BB's materials submitted in response to the PSOF (Docket Entry No. 53 ("Def. Resp.")) are to the exhibit number assigned by BB.  BB has submitted a separate group of exhibits in support of its Statement of Facts (Docket Entry No. 48 ("DSOF")), and all citations thereto are to the exhibit number assigned by BB.  SSD has also provided a sequentially paginated Supplemental Appendix ("SA") in response to the DSOF.  All citations supporting SSD's response to the DSOF are to that Supplemental Appendix, noting the page number and exhibit number.

[2] Although the parties refer to the product by their own designation for it, for sake of uniformity I will refer to the product by SSD's designation throughout this Opinion.

Confidentiality Agreement.  (App. 398-99, Ex. P-35.)  Thereafter, as the collaboration between the parties continued, SSD and BB entered into the superseding NDA on November 2, 2011.  (App. 400-02, P-38.)  The NDA protected the sharing of, among other things, the confidential knowledge, designs, recipes, processes, formulae and other confidential information revealed by SSD during the product development process. (App. 400-02, P-38.)  SSD asserts, and BB denies that, after the execution of the NDA and prior to January 24, 2012, SSD and BB entered into an oral exclusive requirements contract related to the SSD Pretzel Sandwich.  (App. 78-79, Sandy Solmon Dep. 140:7-24, 141:1-16.)  SSD asserts that the oral contract provided that BB would exclusively supply SSD with the amount of the SSD Pretzel Sandwiches it required for a period of two years and, in return, SSD would provide design and engineering expertise with respect to product development, as well as compensate BB for research and development and eventual manufacture of the product.  (App. 139, Ex. P-41; 140-42, Ex. P-42.)  It is undisputed that the parties did not agree on a specific price for the product because they had not yet determined the cost of all materials and SSD had not yet decided which type or brand of proteins it was going to use in each variation of the product.  (App. 139, Ex. P-41; 140-42, Ex. P-42.)

On January 24, 2012, Bryan Freeman sent Sandy Solmon an email stating: "Below is what I have as next steps."  Freeman then listed steps to complete the parties' agreement, including the establishment of pricing and the sending of a written agreement, and concluded "If the above can be achieved quickly, and the pricing works within everyone's margin demands, Rick believes he can rapidly fill up BB's current capacity."

(App. 139, Ex. P-41.)  In that same January 24, 2012 email, Freeman also lists "Sandy's improvements," i.e., certain modifications to product samples to be incorporated into the SSD Pretzel Sandwich, including length, "Wide Slits," "Medium Crumbs.  No boulders and no shake."  (Id.)  He also stated "The look of the product as it relates to the large openings will be exclusive to SS."  (Id.)  On February 2, 2012, Solmon emailed Freeman: "I am hoping that we are making progress in getting samples to the specification we discussed last week.  Can you let me know how it is going. . . All of us are excited an continue to dive into sourcing of protein."  Freeman responded:  "Before proceeding with additional development, I want to check and make sure we are aligned on an important point for me.  Assuming we can hit the right price for you and meet your quality spec, are you OK with making us an exclusive supplier for 2 years?  This is important because I would like some certainty that the effort you and I put into this will result in (at least) a 24 month relationship.  Is this going to work for you?"  Solmon then replied:  "Yes we accept that criteria."  (App. 141.)  During the ensuing months, the parties exchanged photographs with notes by Solmon addressing defects in test samples, approving other attempted test samples, and emails communicating the progress of the product development.  (App. 143-46, Ex. P-17; 156-64, Ex. P-18; 283, Ex. P-19; 257-82, Ex. P-20; 287-88, Ex. P-21; 294-95, Ex. P-23; 139, Ex. P-41; 149-52, Ex. P-44; 153-55, Ex. P-46; 289-91, Ex. P-59.)

The SSD Pretzel Sandwich includes open ends and precision slits on the top of the product, which bloom open during baking to reveal the contents inside.  (App. 143-46, Ex. P-17; 156-64, Ex. P-18; 283, Ex. P-19; 287-88, Ex. P-21; 294-95, Ex. P-23.)  BB

contends that the only specifications of the SSD Pretzel Sandwiches that SSD asserts as proprietary and the subject of its Complaint are: open ends, length of 6 to 7 inches, slits, and crumbs.  (DSOF Ex. C, Solmon Dep. 85:7-13; 89:7-18; 97:8-24; 98:3-7; 86:8-22.)  SSD denies that the four items listed by BB are the only items related to the SSD Pretzel Sandwich that are proprietary to SSD, adding that it also deems proprietary the overall look of the product, the bloom, the color, and the manufacturing process related to the proteins.  (SA 10-15, Solmon Dep. 85:7-24, 86, 87:1-13, 89:7-24-90:17, 97:9-24.[3])

The NDA provides an exception to Confidential Information which "…(c) was in the recipient's possession prior to disclosure, as evidenced by the recipient's written records, and was not the subject of an earlier confidential relationship with the party that disclosed such Confidential Information…"  (DSOF Ex. A ¶ 7.)  The NDA provides another exception to Confidential Information which "…(b) became publicly available after disclosure without breach of this Agreement..."  (Id.)  In her deposition, SSD's Solmon conceded that the length of the SSD Pretzel Sandwiches would be measured by the public by using a ruler.  (DSOF Ex. C, Solmon Dep. 96:24-97:7.)  It is undisputed that SSD showed the SSD Pretzel Sandwich to potential customers other than to the primary customer it disclosed to BB, i.e., Seattle's Best, including for example, 7-Eleven and the AMC movie theater company.

Throughout the spring of 2012, emails and notes between SSD personnel discussed the placement of proteins, presentation of the product, and options for

---

[3] I note that nothing in SSD's excerpts to the summary judgment record relate to the manufacturing process of the proteins.

achieving improvements. (App. 257-82, Ex. P-20; 287-88, Ex. P-21; 294-95, Ex. P-23;

149-52, Ex. P-44; 153-55, Ex. P-46; 289-91, Ex. P-59.)  During this time, BB sent

prototypes of the SSD Pretzel Sandwiches to SSD so that SSD could inspect the samples

and use them for test-marketing and research purposes.  (App. 20, January 2013 Opinion

at p.3; 47, Counterclaim at ¶47.)  When SSD received the product from BB, it removed

them from the BB shipping boxes, inspected them, and decided which individual

prototypes to send to Seattle's Best.  (App. 83, 85-102, Sept.11, 2013 Dep. of Carol

Shocket ("Shocket Dep.") 77:8-24, 136:1-153:24.)  SSD packaged the product in flat

packs with dry ice, affixed a SSD label to each of the flat packs, and put each flat pack in

its own SSD shipping box before sending them to Seattle's Best.  (App. 84, Shocket Dep.

117:3-19.)  The parties dispute whether the product sent to Seattle's Best were test

prototypes or whether they were intended for sale to Seattle's Best's customers.

It is undisputed that, at one point in the Fall of 2011, there was a discussion of

SSD purchasing a majority ownership stake in BB, but the parties did not reach an

agreement.  It is also undisputed that the emails exchanged by the parties do not mention

the concept of a non-compete agreement nor contain any indication that BB could not

make filled pretzel products for third parties.  BB later sent a proposed Memorandum of

Understanding ("MOU") to SSD on January 6, 2012.  The MOU provided that BB owned

all intellectual property associated with the SSD Pretzel Sandwich, but it would agree to

limit sales to certain customers identified by SSD; i.e., BB could sell the product to

potential customers, except for customer or marketing channels identified by SSD.  In

response to the proposed MOU, on January 16, 2012 SSD's Executive Manager Carol

6

Shocket wrote an email to Rick Kirkpatrick, SSD's Vice President of Sale and Marketing, and Sandy Solmon stating that "[w]e will need to give [Freeman] a list of customers we plan on selling [related to the MOU].  Obviously we want to make the list as large as possible."  SSD never agreed to the MOU and it was never executed.

Freeman sent an email to SSD on January 24, 2012 discussing a potential co-packer agreement if the parties entered into an agreement and if certain sales were made at a certain price point.  SSD admits this assertion, but adds that the email was a confirmatory writing evidencing the parties' intent to formalize the terms of their already existing exclusive requirements contract in a formal written co-packer agreement.  A written co-packer agreement was never executed.

It is undisputed that SSD sent BB a proposed written contract entitled "Supply Agreement" on July 30, 2012.  In that agreement, SSD claimed that it owned the intellectual property for the SSD Pretzel Sandwich and BB could only sell a product that appeared similar to the original version to customers listed in Exhibit "A" to the proposed agreement.  SSD did not produce in discovery any of the exhibits referenced in the proposed Supply Agreement.  SSD asserts that the exhibits referenced by the Supply Agreement were never prepared as attachments to the Supply Agreement because BB failed to comply with its obligations and otherwise breached the agreement between the parties.  It is undisputed that the parties did not sign the proposed Supply Agreement.

SSD approached another manufacturer in August 2012, Pellegrino Food Products Co. Inc. ("Pellegrino"), to make the SSD Pretzel Sandwich for Seattle's Best.  (DSOF Ex. B, Solmon Dep. 302:20-24; 303:3.)  SSD did not tell BB about Pellegrino and SSD

continued to request SSD Pretzel Sandwich from BB.  SSD admits that it requested BB to

manufacture and send SSD Pretzel Sandwiches to SSD after it first contacted Pellegrino

in August 2012.  By way of further response, SSD asserts it contacted Pellegrino only

after it learned that BB either had or planned to breach the agreement between the parties

by manufacturing and selling a knock-off version of the SSD Pretzel Sandwich to a third

party in violation of the parties' NDA and alleged exclusive requirements contract.  After

SSD learned about BB's sale of its own pretzel sandwich, it contacted Pellegrino as a

precautionary measure because it needed to ensure that there was a manufacturer able to

manufacture the product in the event that BB was in fact intending to continue to market

its own product. (SA 25-26, Solmon Dep. 264:18-24, 265:1-11.)

SSD asserts that it notified Seattle's Best, prior to the first sale by SSD to Seattle's

Best of the SSD Pretzel Sandwich, that the SSD Pretzel Sandwiches were manufactured

at BB's bakery, by BB.  (App. 165-256, Bates Stamp SS-019242-019333.)  The cited

exhibit is an email dated March 6, 2012, from SSD to Seattle's Best reading "[a]ttached

is a SQF audit of our partner Bakery producing the Pretzel Sandwiches."[4] (App. 165,

Bates Stamp SS-019242.)  The attached audit states on the top of the first page that it is

an audit of BB.  (App. 166-256, Bates Stamp SS-019243-019333.)  That first page is the

only instance where the name "Better Bakery" appears in the document, and the audit

does not mention the SSD Pretzel Sandwich product.

---

[4] The acronym "SQF" is not explained in the record.  It appears to be an abbreviation for
"safe quality food."

SSD asserts that during the period of the parties' collaboration BB developed a secret scheme to steal the distinctive and proprietary design and product development qualities of the SSD Pretzel Sandwich and use them to create its own pretzel sandwich to sell to third-parties.  (App. 8, Complaint at ¶ 29.)  BB denies these allegations.  The first documented sale of a pretzel sandwich by BB to a third-party occurred in August 2012.  (App. 239-45, Ex. P-25; 309-28, Ex. P-12; 346-47, Ex. P-26.)  BB sold pretzel sandwich products to Costco, Sam's Club, BJ's, and Wal-Mart stores through its sales representative, Next Phase Enterprises.  (App. 63-66, 73-74, Freeman Dep. 191:17-25, 192:1-25, 193:1-25, 194:1-2, 238:18-25, 239: 1-5; 309-28, Ex. P-12.)  BB also sold pretzel sandwich products to McClane, Core-Mark, Reliant, and U.S. Foodservice.  (App. 309-28, Ex. P-12.)  SSD asserts that the pretzel sandwich produced and sold by BB to other purchasers used wide top slits and numerous other design elements of the product that was developed expressly by SSD, and acknowledged in writing by BB to be SSD's design features.  (App. 296-308, Ex. P-1; 139, Ex. P-41.)  BB denies these assertions.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity

10

of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. DISCUSSION

SSD's Motion seeks summary judgment on Count I of its own Complaint, asserting that the undisputed material facts show that an enforceable exclusive requirements contract was formed by the parties, and that BB breached both (1) that contract and (2) the NDA by selling its competing product.  SSD also argues it is entitled to summary judgment on BB's Counterclaim I, asserting a Lanham Act violation for reverse passing off.  In its Motion, BB argues that SSD cannot maintain a claim for breach of the supposed oral exclusive requirements contract related to the SSD Pretzel Sandwich because Count I of the Complaint fails to raise the existence and breach of any oral agreement and SSD has never sought to amend its Complaint to include such a claim.  Since Count I alleges only a breach of the parties' written NDA, BB argues that SSD is barred from asserting that Count I incorporates an additional oral agreement. Regarding the NDA, the agreement actually pled in Count I, BB argues that it could not have violated the agreement as a matter of law because (1) the specifications of the SSD Pretzel Sandwich were disclosed to SSD by BB prior to the execution of the NDA, and (2) the specifications became publicly available after disclosure.

BB contends that it is also entitled to summary judgment on SSD's claim for misappropriation of trade secrets because SSD does not have a legally protectable trade secret in the specifications of the SSD Pretzel Sandwich.  It argues that the specifications are entirely visible to anyone examining the product, which is offered for sale to the

public, and "secrets" that are completely disclosed by publicly marketed goods cannot be secret.  It asserts that the specifications BB claims are its trade secrets can be discerned by simply measuring the product.  Finally, BB argues that because the claim for unjust enrichment contained in Count V of SSD's Complaint is entirely derivative of the misappropriation claim, it too fails.

### A.     Failure to Plead the Oral Agreement

BB first argues that, to the extent SSD's Motion argues that SSD is entitled to summary judgment on Count I based upon breach of the purported oral exclusive requirements contract, that claim must fail because SSD never alleged the breach of an oral agreement.  Rather, BB argues, Count I specifically alleges only a breach of the parties written NDA dated November 2011.  (Def. Mem. in Support of Mot. for S.J. at 7; see Complaint ¶ 37-42).)  SSD makes no response to this argument.  I grant BB's Motion to the extent it seeks summary judgment on Count I as to any oral contract.

"Federal pleading standards do not allow a party 'to raise new claims at the summary judgment stage.'"  myService Force, Inc. v. Am. Home Shield, Civ. A. No. 2013 WL 180287, at *12 (E.D. Pa. Jan. 17, 2013) (Padova, J.) (quoting Dewees v. Haste, 620 F. Supp. 2d 625, 635 n. 7 (M.D. Pa.2009) (quoting Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004)) (additional citations omitted); see also Speziale v. Bethlehem Area Sch. Dist., 266 F. Supp. 2d 366, 371 n.3 (E.D. Pa. 2003) (stating that "[p]laintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in" plaintiff's response to a motion for summary judgment) (cited with approval in Carr v. Gillis Assoc. Indus., Inc.,

12

227 F. App'x 172, 176 (3d Cir. 2007)); see also Carr, 277 F. App'x at 176 (determining that district court correctly rejected as untimely plaintiff's new theory of liability that was asserted for the first time in response to defendant's motion for summary judgment). "'District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour.'"  myService Force, Inc., at *12 (quoting Carr, 277 Fed. App'x at 176 (citing Speziale, 266 F. Supp. 2d at 371 n. 3; OTA P'ship v. Forcenergy, Inc., 237 F. Supp. 2d 558, 561 n.3 (E.D. Pa. 2002)).

SSD's Complaint spans 84 numbered paragraphs and specifically mentions only the NDA.  The Complaint is utterly silent as to the existence of any additional agreement between the parties.  Count I asserts that SSD and BB entered into the NDA, pursuant to that written agreement SSD fulfilled its obligations to pay BB for certain product research and design services demonstrating that the SSD Pretzel Sandwich was a "product for hire and proprietary to" SSD, BB frustrated the development of the product in an effort to use the confidential design elements for its own products, and BB breached the NDA by marketing its own version of the SSD Pretzel Sandwich.  (Complaint ¶¶ 37-41.)  The Complaint contains no averments that suggest the existence of an additional oral exclusive requirements agreement between the parties and Count I does not mention the breach of any oral agreement.  Even after being presented with BB's moving papers, SSD has not sought leave to amend the Complaint to incorporate a claim that an additional contract existed, to plead the terms of that contract, and to plead the nature of any breach of that contract.  I conclude, accordingly, that Count I of the Complaint does not assert a claim against BB for breach of the alleged oral agreement.  Accord

13

myService Force, Inc., at *12.  BB's Motion for summary judgment on this alleged claim

is therefore granted, and SSD's Motion for summary judgment is denied to the extent it

that the Motion concerns this non-pled claim.[5]

### B.    Breach of the NDA

BB argues it is also entitled to summary judgment on the contract breach actually

pled in Count I, namely the breach of the NDA, because the record shows there is no

dispute that the specifications of the SSD Pretzel Sandwich (1) were disclosed to SSD by

BB prior to the signing of the NDA, and (2) became publicly available after disclosure

without breach of the NDA.  I find that BB is correct that it is undisputed that the design

specifications became public and were thus excluded from protection under the NDA.

Accordingly, I grant summary judgment to BB on Count I and deny the corresponding

portion of SSD's Motion.

By its terms, the NDA covers the "confidential information" of the "disclosing

party," "which is not generally available to the public and which is commercially

valuable . . . including . . . trade secrets; techniques; methodologies; methods; [and]

product specifications . . . ."  (DSOF Ex. A ¶ 3.)  The parties agreed not to disclose

confidential information "to others or use it for purposes other than the Project."  (Id. ¶

4.)  The parties also stipulated what would **not** constitute confidential information:

> Confidential information shall not include any information which (a) was
> publicly available at the time of disclosure; (b) became publicly available
> after disclosure without breach of this Agreement; (c) was in the recipient's

---

[5] Because I conclude that breach of an alleged oral contract is not part of this case, I need not reach BB's other arguments contending that the alleged contract was never formed, or if formed, is unenforceable.

possession prior to disclosure, as evidenced by the recipient's written records, and was not the subject of an earlier confidential relationship with the party that disclosed such Confidential Information. . . .

(Id. ¶ 7.)

In her deposition, SSD's Solmon testified that the specific aspects of the SSD Pretzel Sandwich that SSD claimed to be proprietary were "the look . . . the bloom slits, which showed the product, the proteins underneath, it was the open ends, and it was the length in particular." (DSOF Ex. C, Solmon Dep. 85:7-13.) She went on to describe the proprietary nature of the length as "greater than 6 inches less than seven, optimum around six and a half, in that range." (Id. 89:11-13.) She described the proprietary nature of the bloom slits as "the angle, it's how open they are, and it's how they show the contents of the inside, so that that [sic] customer knows what's inside. So it's cut on a certain angle. It's a compound angle." (Id. 97:12-16.) She described as proprietary to SSD the nature of the "crumb" topping on the product, namely that it was "[j]ust right sized. . . . Not boulders not dust." (Id. at 86:11-13.) BB argues that, because each of these claimed proprietary elements are readily apparent to anyone who looks at the product and measures it, they do not qualify as "confidential information" under the NDA. It argues that even if it once was confidential information, after SSD began marketing the product to the public, the size and shape of the product and its easily measurable features ceased to be covered by the NDA because they "became publicly available after disclosure without breach of this Agreement."

SSD responds that only some of the proprietary attributes of the SSD Pretzel Sandwich are able to be viewed by the general public, and even though the public can

view some of the proprietary attributes, "the design and engineering processes used to achieve the proprietary attributes are subject to the terms of the NDA and are not viewable or knowable based on the product's appearance." (Pls' Mem in Opp. to Def. Mot. for Summ. Jud. at 20.) Notably, SSD does not identify what other proprietary attributes are not viewable or knowable, identify the design and engineering processes it claims are also covered by the NDA, or cite to record evidence supporting any such assertions.

The only information contained in the summary judgment record concerning other proprietary attributes "not viewable or knowable," or other design and engineering processes is the evidence that SSD "had a special cheese or a special turkey that they wanted kept confidential." (App. 61, Freeman Dep. 108:19-24.) However, there is no suggestion that BB used SSD's special cheese or special turkey, nor is there an allegation or evidence that it copied the manufacturing process related to the proteins when it manufactured and sold its own version of the SSD Pretzel Sandwich, or ever learned how SSD created its special cheese or special turkey. I conclude, consequently, that SSD has failed to meet its summary judgment burden of coming forward with evidence that BB breached the NDA by using SSD's confidential information when it marketed its version of the product.

C.      **Misappropriation of Trade Secrets**

In Count VI of its Complaint, SSD alleges a claim for misappropriation of its trade

secrets,[6] based on the same violation of the NDA that forms the basis of its breach of

contract claim.  (See Compl. ¶ 82 ("Pursuant to the NDA and the understandings and

agreements between the parties, BB was obligated to maintain the confidentiality of the

Sweet Street confidential information relating to the Sweet Street Pretzel Sandwich and

refrain from using such information for its benefit and to the detriment of Sweet

Street.").)  Because SSD has failed to meet its summary judgment burden of coming

forward with evidence that BB breached the NDA when it marketed its version of the

product, I find that it has also failed to meet its summary judgment burden on Count VI.

Under Pennsylvania law, "the elements of misappropriation of trade secrets are:

'(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a

confidential relationship; (3) use of the trade secret, in violation of that confidence; and

(4) harm to the plaintiff.'"  Latuszewski v. VALIC Fin. Advisors, Inc. 393 F. App'x 962,

965 (3d Cir. 2010) (quoting Moore v. Kulicke & Soffa Indus., Inc., 318 F.3d 561, 566 (3d

---

[6] The claim in Count VI is framed as a common law claim.  The United States Court of
Appeals for the Third Circuit has recognized that the Pennsylvania Uniform Trade Secrets Act
("PUTSA"), 12 Pa. Cons. Stat. Ann. § 5301, et seq, "displaced Pennsylvania's common law tort
for misappropriation of trade secrets, but there is no indication that the statute effected a
substantive shift in the definition of trade secret."  Bimbo Bakeries USA, Inc. v. Botticella, 613
F.3d 102, 109 n.7 (3d Cir. 2010) (internal quotation marks omitted); see 12 Pa. Cons. Stat. Ann.
§ 5308 (providing that PUTSA "displaces conflicting tort, restitutionary and other law of this
Commonwealth providing civil remedies for misappropriation of a trade secret" but does not
affect certain remedies including contractual remedies based upon misappropriation of a trade
secret). In accordance with Bimbo Bakeries, the elements of misappropriation of trade secrets
laid out in this Memorandum are based on the statutory cause of action not the historical tort,
while the definition of "trade secret" may reference decisions that both pre- and post-date the
enactment of PUTSA.

Cir. 2003) (citing <u>Van Prods. Co. v. Gen. Welding & Fabricating Co.</u>, 213 A.2d 769, 775

(Pa. 1965)); Restatement (First) of Torts § 757 (1939).  A trade secret is:

> Information, including a formula, drawing, pattern, compilation including a
> customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being
> generally known to, and not being readily ascertainable by proper means
> by, other persons who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the circumstances to
> maintain its secrecy.

12 Pa. Cons. Stat. Ann. § 5302.[7]  "[T]rade secrets need not be technical in nature to be

protected fully by Pennsylvania law."  <u>Bimbo Bakeries</u>, 613 F.3d at 112 (internal

quotation marks omitted).  "Overall, 'the concept of a trade secret is at best a nebulous

one' and, as a result, 'many courts have opined that the question of whether certain

information constitutes a trade secret is a question of fact to be resolved by the jury or the

trier of fact.'"  <u>Certainteed Ceilings Corp. v. Aiken</u>, Civ. A. No. 14-3925, 2015 WL

---

[7] Restatement § 757 similarly defined a trade secret as

> any formula, pattern, device or compilation of information which is used in one's
> business, and which gives him an opportunity to obtain an advantage over
> competitors who do not know or use it.  It may be a formula for a chemical
> compound, a process of manufacturing, treating or preserving materials, a pattern
> for a machine or other device, or a list of customers. . . .  A trade secret is a
> process or device for continuous use in the operation of the business.  Generally it
> relates to the production of goods, as, for example, a machine or formula for the
> production of an article. It may, however, relate to the sale of goods or to other
> operations in the business, such as a code for determining discounts, rebates or
> other concessions in a price list or catalogue, or a list of specialized customers, or
> a method of bookkeeping or other office management.
> *Secrecy.*  The subject matter of a trade secret must be secret.  Matters of public
> knowledge or of general knowledge in an industry cannot be appropriated by one
> as his secret. Matters which are completely disclosed by the goods which one
> markets cannot be his secret.

Restatement (First) of Torts § 757 cmt. b (1939).

410029, at *4 (E.D. Pa. Jan. 29, 2015) (quoting <u>Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC</u>, 13 F. Supp. 3d 465, 474 (E.D. Pa. 2014) (citations and internal quotation marks omitted in original).

BB argues that it is entitled to summary judgment on Count VI because SSD has failed to carry its burden of showing that information it seeks to protect qualifies as a trade secret.  It points out that the allegations of Count VI are void of any facts indicative of a trade secret, its discovery responses were equally nonspecific,[8] and the only information provided by its Rule 30 designee, Sandy Solmon, was the testimony quoted above regarding the size, shape, and appearance of the product.  BB argues that the product specifications cannot function as trade secrets because they are entirely visible to anyone examining the product, which is offered for sale to the public.  BB notes that the Restatement specifies that "[m]atters which are completely disclosed by the goods which are marketed cannot be his secret."  (Def. Mem. at 30 (quoting Restatement (First) of Torts § 797 cmt. b).)  Similarly, PUTSA's definition of a trade secret requires that the information derive "independent economic value, actual or potential, *from not being*

---

[8] BB notes that it requested in its Interrogatory No. 1 for SSD to "[i]dentify with specificity and in detail, any and all trade secrets and/or confidential information that Sweet Street provided to Better Bakery and that Sweet Street believes was subject to either the September 28, 2011 Mutual Confidentiality Agreement ("MCA") or the November 2, 2011 Non-disclosure ("NDA") between the parties."  On May 8, 2013 SSD responded:

…Sweet Street responds that the trade secrets and confidential information disclosed to Better Bakery include, but are not limited to, its business methods, design strategies, consumer appeal strategies, market strategies, product introduction strategies, business practices, design of the Pretzel Melt product, refinements of the Pretzel Melt product, market testing of the Pretzel Melt product, Sweet Street's customer strategy for the Pretzel Melt product, the identity of Sweet Street's current and potential customers…".

*generally known to, and not being readily ascertainable by proper means by*, other persons who can obtain economic value from its disclosure or use."  12 Pa. Cons. Stat. Ann. § 5302 (emphasis added).

SSD responds that the product specifications of the SSD Pretzel Sandwich did not lose their protected status when the product was made publicly available for sale because the "proprietary design and engineering information given by Sweet Street to BB to allow BB to improve its manufacturing process related to the SSD Pretzel Sandwich to ensure that the product looked and tasted unlike any other soft pretzel or sandwich product on the market at the time, is a protected trade secret."  (Pl. Mem. in Opp. to Def. Mot. for Summ. Jud. at 22-23.)  It also asserts that the product specifications "retained their status as protected trade secrets after the public was able to view them because the engineering and design processes could not be reverse engineered just by looking as the SSD Pretzel Sandwich."  (Id. at 23.)

I find that BB is entitled to summary judgment on the misappropriation claim. Although SSD argues that BB stole its "proprietary design and engineering information" to reverse engineer its own pretzel sandwich with the same product specifications, SSD has failed to meet its summary judgment burden to show evidence of any such design and engineering information other than the product specifications themselves.  Solmon testified that the only proprietary elements related to the SSD Pretzel Sandwich were the bloom slits showing the contents, the open ends, and the length.  (DSOF Ex. C, Solmon Dep. 78:23-79:2.)  Notably there is a complete failure of proof that SSD created the process by which the SSD Pretzel Sandwich was to be manufactured.  Although Solmon

approved and disapproved prototypes of the product, when she was asked about the nature of the parties' alleged oral agreement she testified that it was to be BB's role to "manufacture the product, [use] good manufacturing processes at the consistency and quality and *create the look and feel that, you know, we specified*."  (DSOF Ex. C, Solmon Dep. 78:23-79:2 (emphasis added).)  According to SSD's own evidence, BB created the manufacturing process, not SSD.[9]

Because the design elements cannot be trade secrets since they are readily ascertainable and measurable by anyone looking at the product, and there is no evidence that SSD created the manufacturing process to achieve those elements that BB then misappropriated, BB is entitled to summary judgment on Count VI.  Similarly, BB is entitled to summary judgment on SSD's claim in Count V of its Complaint for unjust enrichment.  In Count V, SSD alleges that it complied with its obligation to BB to work with BB in good faith to produce the SSD Pretzel Sandwich by sharing its proprietary and confidential information and paying BB for the research and development services BB provided to SSD.  BB, it alleges, acted in bad faith by misappropriating the proprietary and confidential information to create its own competing product.  Because this claim is derivative of the claim in Count VI for misappropriation of proprietary and confidential information, I conclude that BB is entitled to judgment on this claim as well.

---

[9] As stated earlier, there is no evidence that BB used SSD's special cheese or special turkey or copied the manufacturing process related to those proteins when it manufactured and sold its own version of the SSD Pretzel Sandwich, or ever learned how SSD created its special cheese or special turkey.

### D.       BB's Counterclaim for Lanham Act Reverse Passing Off

Counterclaim I asserts a claim under 15 U.S.C. § 1125(a) for reverse passing off, alleging that SSD falsely designated the SSD Pretzel Sandwich produced by BB as its own product, causing consumer confusion as to the true identity of the producer.  SSD argues it is entitled to summary judgment on this Counterclaim because (1) SSD informed its only actual customer, Seattle's Best, that BB was the manufacturer of the product, and (2) BB has produced no evidence of damages related to the claim.  I find that there are genuine issues of material fact concerning both of these issues, rendering summary judgment for SSD inappropriate.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides:

(1)  Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ...
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  To establish a reverse passing off claim, a plaintiff must show (1) that the product at issue originated with the plaintiff; (2) that origin of the product was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false

designation of origin. See <u>Syngenta Seeds, Inc. v. Delta Cotton Co-op., Inc.</u>, 457 F.3d

1269, 1277 (Fed. Cir. 2006); <u>Lipton v. Nature Co.</u>, 71 F.3d 464, 473 (2d Cir. 1995).[10]

SSD asserts that it is undisputed that it sold the SSD Pretzel Sandwich only to

Seattle's Best, and that it informed that purchaser four months prior to the first sale that

BB was the manufacturer of the product when it sent to Seattle's Best an email attaching

the "SQF audit of our partner Bakery producing the Pretzel Sandwiches." (App. 165,

Bates Stamp SS-019242.)  BB responds that the email does not identify it as the

manufacturer of the specific product; it merely refers to a "partner Bakery." (<u>Id.</u>)  It

argues that, of the 91 pages of the audit attached to the email, the words "Better Bakery"

appear on only the first page, and the audit does not identify it as the manufacturer of the

---

[10] In dismissing SSD's reverse passing off claims under the Lanham Act in the January 2013 Opinion, I stated that:

> "Passing off" occurs when a producer misrepresents his own goods or services as someone else's. <u>See</u> <u>Dastar Corp. v. Twentieth Century Fox Film Corp.</u>, 539 U.S. 23, 28 n. 1 (2003). "Reverse passing off" occurs when the producer misrepresents someone else's goods or services as the producer's own. <u>Id.</u>  As the Supreme Court noted, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill. <u>Id.</u> at 32.  For example, it forbids "the Coca-Cola Company's passing off its product as Pepsi-Cola or reverse passing off Pepsi-Cola as its product." <u>Id.</u>  The Court also cautioned, however, that § 43(a) "does not have boundless application as a remedy for unfair trade practices." <u>Id.</u> at 29. "Because of its inherently limited wording, § 43(a) can never be a federal 'codification' of the overall law of 'unfair competition,' but can apply only to certain unfair trade practices prohibited by its text." <u>Id.</u> (internal citations omitted). . . .  "Reading the phrase 'origin of goods' in the Lanham Act in accordance with the Act's common-law foundations (which were not designed to protect originality or creativity), and in light of the copyright and patent laws (which were), [the Supreme Court concluded] that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." <u>Id.</u> at 37 (emphasis in original).

January 2013 Opinion at 5-7, 2013 WL 81385, at *3 (footnote omitted).

23

specific product SSD was selling to Seattle's Best.  BB adds that it has shown evidence that:

- When the SQF auditor transmitted the audit SSD, the auditor included BB's name in the subject line of the email.  However, when SSD forwarded the audit to Seattle's Best it deleted BB's name from the subject line of the email.  (Compare App. 165 and Def. Resp. Ex. B.)

- When Seattle's Best requested additional nutritional information and labels for the product in March 2012, SSD requested the information from BB.  It then created its own document by cutting and pasting the information supplied by BB onto SSD's own letterhead, deleting any reference to BB.  (Def. Resp. Ex. C, D.)

- Seattle's Best sent SSD a "specification packet" form in March 2012 that requested the identification of the manufacturer.  SSD returned the form with that information left blank.  (Def. Resp. Ex. E.)

- Seattle's Best sent SSD a "Label Information Document" related to the product in August 2012 that requested the identification of any "co-packers."  SSD failed to list BB as the manufacturer on the completed form.  (Def. Resp. Ex. F.)

- Seattle's Best sent SSD another "specification packet" form in August 2012 that requested the identification of the manufacturer.  SSD listed itself as the manufacturer on the completed form.    (Def. Resp. Ex. G.)

- Also in August 2012, SSD identified itself as the manufacturer on a Seattle's Best form entitled "Product Safety Review Approval Form-Food Products." (Def. Resp. Ex. H.)

- In October 2012, SSD again removed BB's name from nutrition labels and copied the information onto its own letterhead prior to sending them to Seattle's Best. (Def. Resp. Ex. I.)

- A Seattle's Best employee specifically asked in a May 24, 2012 email "Could you tell me more about who manufactures [the product]?" because Seattle's Best had heard that SSD had purchased the facility where the product was manufactured. SSD's employee Kelly Sholl sent an email to Sandy Solmon suggesting that SSD answer the question by telling Seattle's Best that the product was manufactured by BB.  Solmon instructed Sholl to tell Seattle's Best that although the SSD Pretzel Sandwich "is being made in another facility, this is our product, designed and spec'd by SSD. . . ."  BB asserts that this information failed to correct Seattle's Best's incorrect understanding that SSD purchased BB's facility and thus became the direct manufacturer.  (Def. Resp. Ex. L.)

Given these factual submissions, I find that BB has met its summary judgment burden of creating a genuine issue of material fact on the issue on whether the origin of the product was falsely designated by SSD.

Finally, SSD asserts BB has failed to meet its summary judgment burden to show it was damaged by SSD's alleged reverse passing off.  It contends:

25

- SSD realized a net loss related to the development and sale of the Sweet Street Pretzel Sandwich.  (App. 473-76, SS-019362-019365.)

- As of March 2013, while SSD sold only $19,837 worth of Sweet Street Pretzel Sandwiches to Seattle's Best, BB sold over $11,385,154 worth of its product to its customers.  (App. 473-76, SS-019362-019365; 369-96, BB Expert Report.)

- While SSD asserts it has realized no net profit on its sales of the Sweet Street Pretzel Sandwich, BB has realized approximately $648,532 in net profit related to the sale of its product.  (App. 397, Bates Stamp BB2048.)

- BB has not produced an export report showing that it suffered any actual damages because of SSD's packaging and labeling methods related to the shipment of the test-prototypes to Seattle's Best.  (PSOF ¶ 65.)

- Because BB stopped manufacturing the Sweet Street Pretzel Sandwiches for SSD in the summer of 2012, there was no possibility of reverse confusion after that time.  (App. 403-72, PSOF Ex. 6.; 477-92, Bates Stamp SS-019334-019349; 493-516, Bates Stamp SS-019371-019394.)

BB responds that its entitlement to statutory damages is not only limited to SSD's profits; its only burden is to show that SSD had sales of the passed off product, while it is SSD's burden to show any costs or deductions claimed; and it has come forward with evidence to show that SSD's claims of costs and deductions are not credible.  I find that BB has met its summary judgment burden on damages.

Pursuant to 15 U.S.C. § 1117(a), a party that is the victim of reversed passed off goods is entitled,

> subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . .  In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.  In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.

15 U.S.C. § 1117(a).  In determining Lanham Act damages, it has been stated that "[s]ection 1117 demands neither empirical quantification nor expert testimony to support a monetary award of actual damages; many sources can provide the requisite information upon which a reasonable jury may calculate damages."  Skydive Arizona, Inc. v. Quattrocchi, 673 F.3d 1105, 1113 (9th Cir. 2012).

BB asserts that it has created a jury question on the issue of whether SSD's purported costs associated with the product are credible.  It cites to the written notes of SSD employee Carol Shocket appearing to document SSD's plan to inflate its costs to make it appear that the product was not profitable.  (Def. Resp. Ex. M ("Sandy [Solmon] wants to give them double the assessment [Seattle's Best] gives to us so it seems like its [sic] not doing that well.").)  It also asserts that SSD's attribution of $185,000 in equipment cost to BB for the product is improper since that equipment was reclaimed by SSD and used by its other partner manufacturer after the parties' relationship ended. (Def. Resp. Ex. N, Freeman Dep. 204:8-16.)  BB also challenges the propriety of including freight costs associated with shipping the product to SSD's facility to permit SSD improperly to change the labeling before reshipping the product to Seattle's Best

27

since that is the conduct at the heart of the claim.  I conclude this is sufficient to satisfy

BB's summary judgment burden on damages since the questions of whether SSD's

alleged costs are or are not proper, and whether it had resulting profits on its sales, are for

the jury to determine.

## V.  CONCLUSION

For the reasons stated, I deny SSD's Motion for Partial Summary Judgment and

grant BB's Motion for Summary Judgment.  Judgment will be entered in favor of BB on

all of SSD's remaining claims.  BB's Counterclaim will be set down for trial.

An appropriate Order follows.[11]

-----

[11] In the Order, I also deny SSD's Motion to Amend the Scheduling Order and Reopen
Discovery (Docket Entry No. 54) and SSD's Motion for Leave to File Reply Memorandum
(Docket Entry No. 58).  Both Motions relate to SSD's attempt to determine the alleged successor
liability of AdvancePierre Foods following its purchase of the assets of BB.  As I determine that
BB is entitled to judgment on all of SSD's remaining claims, these Motions are moot.

Finally, in the Order, I deny for statistical purposes "Plaintiff Sweet Street Desserts,
Inc.'s Motion for Partial Summary Judgment" that was improperly entered as Docket Entry No.
54.  Docket Entry 54 is actually SSD's Memorandum in support of its opposition to BB's Motion
for summary judgment.